

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-4-1994

# Guiffre v. Bissell, et al.

Precedential or Non-Precedential:

Docket 93-5541

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Guiffre v. Bissell, et al." (1994). *1994 Decisions.* Paper 103.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/103

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 93-5541

----------

JAMES J. GIUFFRE,

v.

NICHOLAS BISSELL; RICHARD THORNBURG;
ROBERT SMITH; RUSS LEFFERT; SAM DEBELLA;
RICHARD MEYERS; COUNTY OF SOMERSET,

Appellants
----------

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 92-02014)

----------

Argued Monday, May 2, 1994

BEFORE:  GREENBERG and GARTH, Circuit Judges,
and ROBRENO, District Judge[0]

----------

(Opinion filed August 4, 1994)

----------

Scott D. Rodgers (Argued)
Welaj, Miller & Robertson
21 North Bridge Street
Post Office Box 1034
Somerville, New Jersey  08876

Attorney for Appellants

---

[0]*   Honorable Eduardo C. Robreno, United States District Court
for the Eastern District of Pennsylvania, sitting by designation.

Frank P. Arleo (Argued)
Arseneault, Donohue, Sorrentino & Fassett
560 Main Street
Chatham, New Jersey  07928

Attorney for Appellee

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

This appeal requires us to revisit the doctrine of absolute and qualified immunity in order to determine if we may review at this time the district court's order which denied summary judgment to the individual defendants.  Insofar as the appellee Giuffre's complaint alleges violations of his Fifth, Sixth, and procedural Fourteenth Amendment rights, we hold that the individual defendants are entitled to qualified immunity, and to that extent reverse the district court's order.  We also hold that the district court correctly denied absolute immunity at this time for Somerset County Prosecutor Nicholas Bissell. Without expressing any views as to the merits of Giuffre's remaining claims, we dismiss the balance of the appeal for lack of appellate jurisdiction.

I.

The appellants, Prosecutor Bissell and five of his current and former investigative officers (collectively, "the appellant officials"), and the County of Somerset ("the County"),

appeal the district court's order denying their motion for summary judgment, which was brought against the appellee, James J. Giuffre.

Giuffre's claims against the County and the appellant officials arose from Giuffre's arrest on May 10, 1990 following an official investigation by the Somerset County Prosecutor's Office and other investigative authorities of an alleged drug conspiracy. Within 24 hours of his arrest, and without representation by counsel, Giuffre conveyed ownership to the County of two building lots he owned in neighboring Hunterdon County. That transaction was ostensibly authorized under the forfeiture provisions of N.J.S.A. 2C:64-1[0] because Giuffre signed a written statement admitting that the two building lots were purchased in part with illegal drug proceeds. The forfeited building lots were sold seven months later at public auction, and the drug charges against Giuffre were administratively dismissed by the Prosecutor's Office on October 31, 1991, after Giuffre cooperated in an ongoing drug investigation. Although the

---

[0] N.J.S.A. 2C:64-1, in relevant part, provides:

> a. Any interest in the following shall be subject to forfeiture and no property right shall exist in them:
>
> (1) Controlled dangerous substances . . .. shall be designated prima facie contraband.
> * * *
> (4) Proceeds of illegal activities, including, but not limited to, property or money obtained as a result of the sale of prima facie contraband as defined by subsection a.(1) . . ..

statute of limitations at this juncture has yet to run, Giuffre still has not been indicted.[0]

On May 7, 1992, Giuffre filed the instant action, seeking compensatory and punitive damages against the County and against the appellant officials, both in their official and individual capacities, for violations of 42 U.S.C. § 1983, the United States Constitution, and New Jersey law.[0]  In his

---

[0]At oral argument, all counsel admitted that, despite the virtual conclusive proof that Giuffre was involved in drug distribution, Giuffre had not been indicted.  Counsel for Giuffre readily acknowledged that there was "never any question" that Giuffre had cocaine in his house at the time of his arrest. Transcript of Oral Argument at 30.  The suggestion was voiced by the attorney for the County and appellant officials that, although the criminal case against Giuffre was "air-tight," the County Prosecutor's Office "felt that it would look like vindictive prosecution" if it indicted Giuffre after he commenced this civil action.  Id. at 21-23.  The County thus made a "strategical decision at the beginning of [this civil] case" not to indict Giuffre so as to avoid any "inconsisten[cy in] establishing during the trial that there was, in fact, a deal that is enforceable."  Id. at 22.

[0]  The eight-count complaint names as defendants:  Somerset County Prosecutor Nicholas Bissell; the Prosecutor's chief of detectives, Richard Thornburg; deputy chief of detectives, Robert Smith, Sergeant Richard Meyers and Detective Samuel DeBella of the Prosecutor's Office; and Warren Township police detective Russell W. Leffert, who was working with the Prosecutor's investigators.
    Counts 1 and 2 of Giuffre's complaint allege that the appellant officials conspired to deprive Giuffre and actually deprived Giuffre of his constitutional and civil rights in violation of 42 U.S.C. §§ 1983 and 1985.  Count 3 alleges that the officials conspired to violate Giuffre's rights under the United States Constitution.  Count 4 alleges that the County had a de facto policy of targeting for criminal investigation and prosecution individuals who owned substantial assets, and of obtaining those assets through fraud and duress, and in violation of their constitutional and civil rights, and that that alleged policy was maintained and implemented by Prosecutor Bissell, Chief Thornburg, and other members of the Prosecutor's staff.  Count 5 asserts violations of 42 U.S.C. §§ 1983 and 1986 by

complaint against the County and the officials, Giuffre also sought judgment rescinding the sale of his forfeited lots, and a declaratory judgment that the officials conspired to violate and/or violated his constitutional and civil rights, and conspired to deprive him of his property through fraud, duress and without due process of law.

The County and the officials moved for summary judgment, arguing, among other things, that the individual officials were entitled to qualified and/or absolute immunity. Their summary judgment motion was supported by the depositions of the appellant officials and other witnesses who denied the allegations in Giuffre's complaint. In opposition to summary judgment, Giuffre presented his own deposition evidence, which created a dispute of fact over the circumstances under which he conveyed title to his two building lots. After considering the parties' arguments and conflicting evidence, the district court on July 29, 1993 denied the defendants' motion for summary judgment.

The district court determined that summary judgment was inappropriate because Giuffre's deposition testimony raised genuine issues of material fact regarding: (1) the appellant officials' allegedly coercive and unconstitutional conduct toward Giuffre; (2) the existence of an alleged civil rights conspiracy;

_____

virtue of the alleged failure of Bissell and Thornburg to train and supervise properly their subordinates.

In Counts 5, 6, and 7, Giuffre asserts claims against the officials for alleged violations of New Jersey law.

(3) the existence and effects of the County's alleged policy of targeting criminal defendants who owned substantial assets, and (4) the alleged failure of the County to train and supervise properly the appellant officials.  The district court did not discuss at length the immunity defenses raised by the individual officials.  The court ruled that Prosecutor Bissell was not entitled to absolute prosecutorial immunity because Bissell's actions could be characterized as investigatory.  It also ruled that none of the individual officials was entitled to qualified immunity because Giuffre had raised a genuine issue of material fact as to whether any clearly established laws had been violated by the officials.

On appeal, the County and the officials contend, as they did before the district court, that they were entitled to summary judgment because:  (1) Giuffre has failed to state a viable cause of action under § 1983 for violations of his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution; (2) the officials lacked the requisite personal involvement and specific conduct to be held liable under § 1983 for federal constitutional violations or under the New Jersey Tort Claims Act for state law violations; (3) the individual officers are shielded, in any event, from suit on Giuffre's federal and pendent state claims under principles of absolute and/or qualified immunity; and (4) there is insufficient evidence to hold the County liable under any of the legal theories stated by Giuffre.

We will affirm that portion of the July 29, 1993 order of the district court denying Prosecutor Bissell absolute immunity, and we will reverse that order only to the extent that it denies the officials qualified immunity for alleged violations of the Fifth and Sixth Amendments, and the procedural due process guarantee of the Fourteenth Amendment. We will dismiss the balance of this appeal for lack of appellate jurisdiction.

## II.

The County and the appellant officials urge us to reverse the district court's denial of their motion for summary judgment. Generally, we ordinarily have no jurisdiction to review orders denying summary judgment because such orders are not final within the requirements of 28 U.S.C. § 1291. W.D.D., Inc. v. Thornbury Township, 850 F.2d 170, 171 (3d Cir.) (in banc), cert. denied, 488 U.S. 892 (1988).

The Supreme Court has held, however, that an order denying qualified or absolute immunity, to the extent that the order turns on an issue of law, is immediately appealable under the collateral order doctrine. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). That is because the immunity doctrine does not serve merely as a public official's defense to liability; rather it shelters that official from having to stand trial. This immunity from suit is lost when a case is erroneously permitted to go to trial. Id. at 526-27; Brown v. Grabowski, 922 F.2d 1097, 1105 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991). We

thus have appellate jurisdiction to consider the immunity issues
raised by the individual officials.

A.

Up to this point, Giuffre's claims for declaratory
judgment and for judgment rescinding the forfeiture of his lots
have not been ruled upon.  In addition, the district court has
refused to certify as final its order denying summary judgment on
Giuffre's claims for money damages, pursuant to 28 U.S.C.
§1292(b).[0]  Giuffre's damage claims, however, are joined in his
complaint with an ostensible claim for prospective injunctive
relief.  We have held in Prisco v. United States Dep't of
Justice, 851 F.2d 93, 94 (3d Cir. 1988), cert. denied sub nom.
Smith v. Prisco, 490 U.S. 1089 (1989), that the inclusion of a

_____

[0]  28 U.S.C. § 1292(b) provides:

> When a district judge, in making in a civil action
> an order not otherwise appealable under this
> section, shall be of the opinion that such order
> involves a controlling question of law as to which
> there is substantial ground for difference of
> opinion and that an immediate appeal from the
> order may materially advance the ultimate
> termination of the litigation, he shall so state
> in writing in such order.  The Court of Appeals
> which would have jurisdiction of an appeal of such
> action may thereupon, in its discretion, permit an
> appeal to be taken from such order, if application
> is made to it within ten days after the entry of
> the order:  Provided, however, That application
> for an appeal hereunder shall not stay proceedings
> in the district court unless the district judge or
> the Court of Appeals or a judge thereof shall so
> order.

viable claim for prospective equitable relief bars interlocutory review of a district court's denial of immunity.

Our Prisco opinion explained why the Mitchell collateral order doctrine is not available for a joinder of claims for injunctive relief and money damages:

> The marginal benefit to a governmental official from an interlocutory review of a ruling that proof of damages should not be heard is so slight that it cannot outweigh the systemic harms from permitting piecemeal interlocutory review of discrete issues in a case which, even against that official, will be ongoing.

Id. at 96. Although we alone among the courts of appeals adhere to such a rule, we nevertheless are bound to follow Prisco in those cases where a plaintiff states a colorable claim for injunctive relief in addition to a claim for damages. See, e.g., Burns v. County of Cambria, 971 F.2d 1015, 1019 (3d Cir. 1992), cert denied sub nom. Roberts v. Mutsko, 113 S. Ct. 1049 (1993); see also Internal Operating Procedures, United States Court of Appeals for the Third Circuit, Rule 9.1 ("The holding of a panel in a reported opinion is binding on subsequent panels . . . . in banc consideration is required [to overrule such a holding].").

Proper application of the Prisco rule requires an initial determination of whether a claim for injunctive relief is, on its face, colorable. Acierno v. Cloutier, ___ F.3d ___, 1994 WL 318783 * 8 (slip op. at 21) (3d Cir. July 7, 1994) ("Prisco allows us to 'examine[] the complaint carefully to determine whether any of its allegations would permit proof of facts warranting any prospective relief against [the defendant officials].'") (quoting Prisco, 851 F.2d at 96). In the instant

case, Giuffre's complaint clearly does not state a colorable claim for prospective equitable relief.

It is obvious to us that Giuffre's claim for rescission of the forfeiture of his property to the County is not viable. Giuffre's counsel admitted as much at oral argument when he acknowledged that Giuffre "would have a tough time rescinding" sale of the lots because "at least one [of the lots] is in the hands of a bonafide purchaser." Transcript of Oral Argument at 45-46. Moreover, as the appellant officials point out, Giuffre has failed to name as defendants those individuals whom he claims conspired with the officials to acquire ownership of his building lots. Even if the failure to name those individuals was not fatal to a claim of rescission, it is the County and not the officials that would be subject to the prospective relief sought by Giuffre. Giuffre transferred title of the two building lots to the County, and the County sold the lots at public auction.

Hence, the individual officials could not rescind the sale, in any event, and would be liable only for compensatory and punitive damages. Indeed, counsel conceded at oral argument that Giuffre is seeking only money damages in his action against the County and the officials.[0] As such, the relief sought by

_____

[0]At oral argument, the following exchange took place:

> THE COURT: [A]m I correct in saying that what Mr. Guiffre wants is the money for the two lots?
>
> [COUNSEL FOR GIUFFRE]: Essentially, there are some other minor damage components, but essentially, that's --
>
> THE COURT: They're all translatable into money?

Giuffre is purely legal, and cannot be cast as prospective or equitable in character.

Because the actual remedy sought by Giuffre does not involve prospective, equitable relief, we hold that the rule of Prisco is inapplicable here. Acierno, ____ F.3d _____, 1994 WL 318783 at * 9 (slip op. at 22) (holding that the lack of any viable available injunctive relief against defendant officer, as alleged in the plaintiff's complaint, entitled the defendant to immediate review of denial of summary judgment on immunity grounds). Without immediate appellate review, the officials in the instant case would be effectively deprived of their immunity from suit -- their "right not to stand trial" -- on Giuffre's federal claims for damages, merely because Giuffre has included in his complaint what he himself concedes is a nonactionable claim.

To hold otherwise might encourage future plaintiffs to add frivolous equitable claims to their damage claims so as to defeat the immediate appeal of orders denying official immunity. See Schrob v. Catterson ("Schrob II"), 967 F.2d 929, 940-41 (3d Cir. 1992) (noting that other courts of appeal which have rejected Prisco have expressed such a concern); cf. Scott v. Lacy, 811 F.2d 1153, 1154 (7th Cir. 1992) ("plaintiffs who wished to harass officials to travail would need only demand equitable

[COUNSEL FOR GIUFFRE]: Correct.
Transcript of Oral Argument at 45.

relief, defeating the defendants' opportunity to obtain prompt review").

B.

Giuffre argues, however, that we are without jurisdiction to hear the instant appeal because the district court denied immunity due to the existence of material disputes of fact. Contrary to Giuffre's position, the immediate appealability of orders denying immunity is not automatically defeated merely because some issues of material fact remain. Kulwicki v. Dawson, 969 F.2d 1454, 1460 (3d Cir. 1992) ("Insofar as there may be issues of material fact present in a case on appeal, we would have to look at those facts in the light most favorable to the non-moving party."). In a non-Prisco case such as this one, we have jurisdiction to determine, as a matter of law, whether the individual officials' alleged conduct violated any "clearly established" constitutional rights. Mitchell, 472 U.S. at 530; Brown v. Grabowski, 922 F.2d at 1109.

Here, our task is somewhat complicated by the fact that the district court failed to make the threshold determination of whether the officials were entitled to immunity in the face of Giuffre's factual allegations. The district court never determined, as it was obliged to do, "'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.'" Brown v. Grabowski, 922 F.2d at 1109 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1981)). Indeed, the district court did not even identify the

specific constitutional rights allegedly violated by the individual officials.  It merely concluded "that whether Defendants violated any clearly established laws constitutes a genuine issue of material fact."  Dist. Ct. Slip Op. at 8.

As part of our plenary review of a district court's immunity determination, we have jurisdiction to determine whether the plaintiff has asserted a violation of a constitutional right under 42 U.S.C. § 1983.  See Siegert v. Gilley, 500 U.S. 226, 231 (1991); D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1369 (3d Cir. 1992) (in banc), cert. denied, 113 S. Ct. 1045 (1993).  That is because "'[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.'"  D.R. by L.R., 972 F.2d at 1368 (quoting Siegert v. Gilley, 500 U.S. at 232) (emphasis added in D.R. by L.R.).

Before us, Giuffre identifies the federal civil rights and constitutional claims against the individual officials in Counts 1, 2, and 3 of his complaint as sounding in the Fifth, Sixth, and Fourteenth Amendments.  We have jurisdiction to consider the individual officials' assertion of entitlement to immunity to suit on those claims, but only to the extent that we can make that determination as a matter of law.[0]  See Burns, 971 F.2d at 1019.

_____

[0]To the extent that the complaint charges the official defendants with liability in their official capacity, we understand that the

As we have previously indicated, however, we are without jurisdiction to review the denial of summary judgment on the remaining claims raised by Giuffre against the County and the appellant officials. Those remaining claims are not subject to immunity under the Mitchell doctrine, and thus cannot be reviewed on interlocutory appeal.

The denial of summary judgment on Giuffre's claims in Counts 4 and 5 of his complaint, seeking damages against Prosecutor Bissell and Chief Thornburg for failing to train and supervise subordinates in the Prosecutor's Office, is not immediately appealable. That is because the County is the real party in interest with respect to these claims, and the County cannot assert a qualified immunity defense so as to qualify, under Mitchell, for review of the district court's summary judgment ruling. Brown v. Grabowski, 922 F.2d at 1105; see also Owen v. City of Independence, 445 U.S. 622, 638, 650 (1980) (holding that § 1983 does not accord municipal corporations a qualified immunity for their good-faith constitutional violations).

That portion of the interlocutory order of the district court denying the appellant officials immunity on Giuffre's pendent state claims, contained in Counts 6, 7, and 8 of Giuffre's complaint, also is unreviewable at this time. As we explained in Brown v. Grabowski, decisions concerning immunity

practical effect of that characterization is to charge the County with liability. As discussed in text, the County, as the real party in interest, does not have a qualified immunity defense available to it.

from suit on _federal_ claims fall within the small class of appealable decisions -- carved out by the Supreme Court in Cohen v. Beneficial Indus. Loan Corp, 337 U.S. 541, 546 (1949) -- that "'finally determine claims of right separable from, and collateral to, rights asserted in the action.'" 922 F.2d at 1106 (quoting Mitchell, 472 U.S. at 527-29). The denial of a claim of qualified immunity premised upon _state_ law, on the other hand, is appealable only if the state has conferred an underlying substantive immunity from suits arising from the performance of official duties. 922 F.2d at 1106-07. Because the New Jersey Tort Claims Act provides a government official with immunity from _liability_, not immunity from _suits_ arising from the performance of official duties, we must dismiss for lack of appellate jurisdiction that portion of the officials' appeal which is based on immunity under the New Jersey Tort Claims Act. Id. at 1108-09.

Accordingly, the scope of our jurisdiction for present purposes is limited to a review of the denial of absolute immunity for Prosecutor Bissell and the denial of qualified immunity for Bissell and the other individual officials on the claims against them for alleged violations of Giuffre's Fifth, Sixth, and Fourteenth Amendment rights.

### III.

Because an understanding of the factual record is essential to our determination of whether we can, as a matter of law, decide the individual officials' entitlement to immunity on

Giuffre's Fifth, Sixth, and Fourteenth Amendment claims, we detail the circumstances surrounding Giuffre's arrest and the forfeiture of his lots.

The record reveals that the Somerset County Prosecutor's Office obtained court authorization to wiretap Giuffre's telephone after a confidential informant identified Giuffre as a drug dealer. Following the interception of numerous calls relating to illegal drug activities, and the contemporaneous surveillance of suspected drug transactions, a team of County investigators and police officers led by Sergeant Richard A. Meyers of the County Prosecutor's Office executed a search warrant for Giuffre's person and house on May 10, 1990. The authorized search of Giuffre's residence resulted in the seizure of approximately 17 grams of cocaine, 15 grams of marijuana, drug paraphernalia, and Giuffre's hunting gun and knife collections. Also seized were financial records and documents, including deeds for the two building lots owned by Giuffre.

Following his arrest, Giuffre was transported to a satellite office of the County Prosecutor. There, Giuffre was given his Miranda warnings and was questioned by Sergeant Meyers and Warren Township police detective Russell W. Leffert, who was working with the Prosecutor's Office in the investigation. Detective Samuel J. DeBella of the Prosecutor's Office also was present during this interrogation. By all accounts, Giuffre indicated his willingness to cooperate with the investigators. According to Giuffre, however, he wanted to talk with his

attorney, and his repeated requests to do so, he claims, were either ignored or denied by Sergeant Meyers and Detectives Leffert and DeBella.

Giuffre waived his right to have counsel present, he contends, only because he "was afraid that if I tried to push that right that harm would come to me."  App. 292.  Specifically, Giuffre alleges that during almost three hours of questioning, the officers "threatened that they were going to lock my girlfriend up, take her [handicapped] son away. . . . [i]f my dogs barked at them they were going to shoot the dogs," and that, if Giuffre did not cooperate, he would be put in jail "with a bunch of guys that believe I informed on them."  App. 289. Meyers, Leffert, and DeBella maintain that they never threatened Giuffre; that Giuffre never asked to speak with an attorney; and that Giuffre voluntarily waived his Miranda rights and gave a taped statement.

After giving the taped statement, Giuffre was processed on charges of possession of cocaine, possession with intent to distribute cocaine, and conspiracy to distribute cocaine.  He was then transported to the Somerset County Jail, where on the orders of the Prosecutor's Office, Giuffre alleges, he was again denied any contact with his attorney.

On the following day, May 11, 1990, Giuffre was transported to the Somerset County Police Academy.  At his request, he met there with Robert A. Smith, the Prosecutor's deputy chief of detectives, and discussed the possibility of becoming a confidential informant.  Giuffre recalls Deputy Chief

Smith initiating a conversation about Giuffre's assets. Giuffre's recollection is that he informed Smith that he had paid approximately $175,000 for the two Hunterdon County building lots, and that Smith suggested that, "You may be able to get out of this if you cooperate and you're willing to sign these lots over to the county." App. 239.

Giuffre was then taken to see Richard Thornburg, the chief of detectives for the County Prosecutor's Office. Chief Thornburg advised Giuffre that the County had the authority to seize his house, his car, and any personal belongings used in illegal drug transactions. According to Giuffre's version of their conversation, Chief Thornburg made an offer: if Giuffre turned over his two building lots and arranged "one good deal" as an informant, Giuffre's car and other personal items would be returned to him; he would be released on his own recognizance with no bail; he would not be indicted; the criminal charges would be dismissed, and therefore he would keep his professional insurance and builder's licenses. App. 317–18.

Giuffre claims that Chief Thornburg gave him an hour to make up his mind, but forbad him from speaking first with his attorney. Giuffre further alleges that Chief Thornburg threatened that, if Giuffre refused to cooperate, his home and the building lots would be forfeited; his fiancee would be put out of the house they shared and possibly face criminal charges herself; he would "rot in jail for a year" before going to trial, and he would lose his professional licenses. App. 312.

At a second meeting with Chief Thornburg, also on May 11, 1990, Giuffre signed over the deeds for the two lots for $1. Giuffre remembers being "floored" when he was asked at that meeting to sign a prepared statement attesting to the fact that he had bought the lots with illegal drug proceeds. App. 329. He insists that he made it clear to Chief Thornburg and Detective Leffert that "not one cent of illegal money [was] used to buy those lots." Id. Giuffre also alleges that he again demanded, and was again denied, his right to have a lawyer present. Giuffre nevertheless signed the statement averring that illegal drug proceeds were used to purchase the property. App. 330-31.

Chief Thornburg and Deputy Chief Smith together offer a significantly different version of the circumstances surrounding the forfeiture of the building lots. They deny having had any prior knowledge of the lots before Giuffre proposed substituting those lots in lieu of the forfeiture of his house and car. They were amenable to Giuffre keeping his car and his house, they contend, only because that would facilitate Giuffre's effectiveness as an informant. As Deputy Chief Smith explained in his deposition, their feeling was that Giuffre "needed the vehicle to cooperate with," and it was better for Giuffre "to do his dealings out of, his house, instead of going to a motel," because "[p]eople get nervous from motels." App. 450. Chief Thornburg maintains that Giuffre voluntarily acknowledged that the lots were purchased in part from the proceeds of illegal drug distribution, and that he never made any promises that Giuffre would not be prosecuted if he cooperated and turned over the

building lots.  Thornburg denies that Giuffre ever requested an attorney at any time during their discussions.  He also denies ever threatening harm to Giuffre, Giuffre's fiancee, or Giuffre's dogs.

Prosecutor Bissell apparently had no direct contact with Giuffre on May 11, 1990.  He did, however, direct Chief Thornburg to ask Giuffre certain questions during the negotiations which resulted in the forfeiture of Giuffre's building lots.  Bissell wanted to know which individuals Giuffre could identify as possible targets of an official investigation, and also "whether or not the lots had somehow been involved in the drugs, in the money, did any of the money from the drugs, was that used to purchase the lots?"  App. 362-65.  Bissell testified at his deposition that he was assured by Chief Thornburg that "some or all of the money used [to purchase] the lots was -- came from drugs."  Id.  Although initially inclined against entering into any kind of agreement with Giuffre, Bissell says he later "acquiesced against [his] better judgment" at the urging of Chief Thornburg, who felt "that Giuffre was someone who could provide valuable information."  App. 361.

After Giuffre signed over the deeds for the building lots, he was released on his own recognizance.  Two days later, Giuffre told attorney Richard Gordeck, a childhood acquaintance, about the forfeiture of the lots.  He also told Grodeck that the Prosecutor's Office had promised to dismiss the criminal charges if he cooperated as a confidential informant and produced one

defendant of substance, but that he was warned against discussing the matter with an attorney.

Grodeck subsequently met with Chief Thornburg and Assistant Somerset County Prosecutor James R. Wronko, and attempted to "reconstruct the deal because Giuffre wanted the lots back." App. 417. Chief Thornburg states that he told Grodeck that the County was "willing to give the lots back" and to "start from scratch," meaning that Giuffre would be prosecuted on the criminal charges. App. 417. However, Grodeck does not recall Thornburg saying that the deal could be rescinded. In any event, at the meeting Grodeck focused on having the agreement with Giuffre put in writing, rather than pressing for a return of the lots, because Giuffre's ultimate goal was a dismissal of the criminal charges. The transaction with Giuffre was never formally memorialized, however, because the County Prosecutor's Office had a policy of not putting confidential informant agreements in writing.

Immediately thereafter, Giuffre alleges that Chief Thornburg and Assistant Prosecutor Wronko told him to get rid of his lawyer "or the deal is off." App. 1122. Giuffre complied and, on June 1, 1990, he appeared without counsel before the Somerset County Superior Court for an initial hearing on the drug charges. The court postponed the hearing and gave Giuffre a week to hire a new attorney. Giuffre claims that members of the County Prosecutor's Office then arranged for him to be represented by a public defender, notwithstanding his protestations that he did not qualify as an indigent because he

owned assets.  Chief Thornburg, Assistant Prosecutor Wronko, and

Detective DeBella each deny any involvement in Giuffre's decision

to discharge his privately-retained counsel and his application

for representation by a public defender.  Giuffre, in any event,

never appeared again in court to answer the drug charges against

him.

        Following his arrest, Giuffre began cooperating with

County investigators, meeting regularly with Detective DeBella

and others from the Prosecutor's office.[0]  Giuffre alleges that

during this time, in July 1990, Prosecutor Bissell indicated to

him that he would have the first opportunity to buy back his

building lots, but his offer of $100,000 cash for the lots was

later rejected by Bissell as insufficient.  Giuffre further

alleges that he was also told, by Detective DeBella, that the

County had a policy of targeting individuals with substantial

amounts of cash and/or assets.  App. 335-37.  Detective DeBella

admitted in his deposition testimony that, in fact, he had told

Giuffre that "we don't want people just for the drugs, we have to

---

[0]While working with the County Prosecutor's Office, Giuffre
surreptitiously taped his conversations with investigators. Those
tapes were turned over to his public defender, who in turn sent
them to the New Jersey Attorney General's Office.  A subsequent
investigation by the Attorney General's office into Giuffre's
allegations of official misconduct by Prosecutor Bissell, members
of the County Prosecutor's office, and others, was closed without
further action after state authorities failed to uncover any
evidence corroborating Giuffre's allegations. App. 979.  All
relevant documents were thereafter forwarded by the New Jersey
Attorney General's Office to the United States Attorney's Office
for New Jersey, which also conducted an inquiry into the same
allegations raised by Giuffre.  Id.

get people with assets." App. 526-29. DeBella, however, denied any knowledge of a County policy of targeting individuals with substantial assets, explaining that his remarks to Giuffre meant only that "if you take away [a drug dealer's] money, then he can't buy drugs, he can't distribute drugs." App. 528-29.

On October 31, 1991, Giuffre was granted an administrative dismissal of the outstanding criminal charges, ostensibly because Giuffre's cooperation had led to the prosecution of four other criminal defendants for drug-related offenses. In the meantime, the County had authorized the sale of Giuffre's two forfeited lots at a public sale, notice of which was published. Each lot sold for $10,000.

IV.

In considering the merits of the officials' appeal of the district court's order denying immunity, we first address the question of whether Prosecutor Bissell was entitled to absolute immunity. Our review of this legal issue is plenary, and we must view the evidence and the inferences to be drawn from that evidence in the light most favorable to Giuffre. Kulwicki, 969 F.2d at 1461.

The district court determined that Prosecutor Bissell was not entitled to absolute immunity "to the extent that [his] actions can be characterized as investigative functions." Dist. Ct. Slip Op. at 8. Bissell challenges that determination, claiming that he was completely uninvolved with the investigative procedures leading up to consummation of the property forfeiture

deal with Giuffre, and that his conduct "constituted a core prosecutorial function; i.e., the evaluation of information in furtherance of deciding the appropriate course of criminal prosecution."  County rpl.br. at 10.

In Kulwicki, we set forth the law concerning the immunity of prosecutors from suit under § 1983:

> Prosecutors are subject to varying levels of official immunity.  Absolute immunity attaches to all actions performed in a "quasi-judicial" role.  Imber v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 994-95, 47 L.Ed.2d 128 (1976).  This includes activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out-of-court behavior "intimately associated with the judicial phases" of litigation.  See id.; Fry [v. Melaragno], 939 F.2d [832, 838 (9th Cir. 1991)] (activity occurring as part of presentation of evidence is absolutely protected). By contrast, a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity.  Imber, 424 U.S. at 430-31, 96 S.Ct. at 994-96; Burns v. Reed, [500 U.S. 478], 111 S. Ct. 1934, 1938 n.2, 114 L.Ed.2d 547 (1991).   In addition, there may be instances where a prosecutor's behavior falls completely outside the prosecutorial role.  See Rose v. Bartle, 871 F.2d 331, 346 (3d Cir. 1989).  In that case, no absolute immunity is available.
>
> In determining whether absolute immunity is available for particular actions, the courts engage in a "functional" analysis of each alleged activity.  See Harlow v. Fitzgerald, 457 U.S. 800, 811, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982); Rose, 871 F.2d at 343.  Three factors determine whether a government official should be given absolute immunity for a particular function:  1) whether there is "a historical or common law basis for the immunity in question;" 2) whether performance of the function poses a risk of harassment or vexatious litigation against the official; and 3) whether there exist alternatives to damage suits against the official as means of redressing wrongful conduct.  Mitchell, 472 U.S. at 521-22, 105 S.Ct. at 2812.  See Burns, 111 S.Ct. at 1938; Fry, 939 F.2d at 836 n.6.

Where absolute immunity does not apply, qualified immunity protects official action, if the officer's behavior was "objectively reasonable" in light of the constitutional rights affected. [Brown v.] Grabowski, 922 F.2d at 1109; Schrob [v. Catterson "Schrob I"], 948 F.2d [1402, 1421 (3d Cir. 1991)]. Objective reasonableness is measured by the amount of knowledge available to the officer at the time of the alleged violation. See Grabowski, 922 F.2d at 111.

The decision to initiate a prosecution is at the core of a prosecutor's judicial role. Imber, 424 U.S. at 430-31, 96 S.Ct. at 994-96. See Rose, 871 F.2d at 343. A prosecutor is absolutely immune when making this decision, even when he acts without a good faith belief that any wrong-doing has occurred. See Rose, 871 F.2d at 347 n. 12; Joseph v. Patterson, 795 F.2d 549, 557 (6th Cir. 1986), cert. denied, 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987). Harm to a falsely-charged defendant is remedied by safeguards built into the judicial system--probable cause hearings, dismissal of the charges--and into the state codes of responsibility. Burns, 111 S.Ct. at 1939, 1942.

969 F.2d at 1463-64.

More recently, the Supreme Court in Buckley v. Fitzsimmons, 113 S. Ct. 2606 (1993), reaffirmed the principle that "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity," although those duties and functions may be protected by qualified immunity. Id. at 2615. The Court reasoned that, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" Id. at 2616. The

Court also held that the official seeking absolute immunity bears the burden of showing it is justified for the function in question. Id. at 2613. Based on that reasoning, the Court in Buckley held that a prosecutor, who was sued in a § 1983 action by a released murder suspect, was not entitled to absolute immunity because he was not acting as an advocate for the State when he allegedly fabricated evidence against the murder suspect and made false statements to the press about that evidence. The Buckley prosecutor thus had to seek protection under the qualified immunity doctrine. Id. at 2617-18.

With these principles in mind, we examine the allegations against Prosecutor Bissell to determine whether his alleged conduct is absolutely immune from liability. As we have already discussed, Giuffre's complaint charges Bissell with conspiring with others to deprive him both of his right to counsel and of his property rights without due process of law. Giuffre alleges that, as part of that conspiracy, Bissell rejected as inadequate Giuffre's offer to buy his lots back for $100,000, although the two lots were ultimately sold for a total of $20,000 at the public sale and subsequently transferred to two individuals with alleged ties to the Prosecutor's Office.

The record discloses that: Bissell engaged in a series of discussions with Chief Thornburg during the forfeiture discussions with Giuffre on May 11, 1990; he directed Thornburg to question Giuffre about suspected drug dealers and as to whether the lots had been purchased with illegal drug proceeds; he approved the transaction whereby Giuffre forfeited his

property to the County and cooperated in an ongoing investigation, and he also, ultimately, approved the administrative dismissal of the drug charges against Giuffre. The evidence further shows that the lots were sold on the recommendation of Bissell, who never had the property valued by a licensed appraiser.

Viewing this evidence in the light most favorable to Giuffre, we cannot hold that Bissell is entitled to absolute prosecutorial immunity for his role in the sale of Giuffre's forfeited property by the County. Bissell's actions in the allegedly improper sale of the property seized by the government clearly involved administrative duties, for which he is not entitled to absolute immunity. Buckley v. Fitzsimmons, 113 S.Ct. at 2615; Schrob I, 948 F.2d at 1419.

Nor do we believe that Bissell has satisfied his burden of demonstrating that absolute immunity shields him from any liability for his allegedly improper conduct in the negotiated transaction with Giuffre. Bissell's alleged conduct cannot properly be characterized as "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial," which are therefore entitled to the protection of absolute immunity. See Buckley v. Fitzsimmons, 113 S.Ct. at 2615. The approval and authorization of a transaction whereby Giuffre escaped prosecution for serious drug offenses does not constitute the initiation of a prosecution, for which judicial safeguards exist to protect the defendant. To the contrary, the very essence of the transaction with Giuffre was the avoidance of

prosecution. Indeed, Bissell concedes that the negotiations with Giuffre for his cooperation were focused on a dismissal of the charges, and not on a guilty plea.

Significantly, Bissell points us to no analogous historical or common-law basis for an absolute immunity for prosecutors who advise investigators on how to proceed with the type of informal transaction here, whereby an arrestee in an "air-tight" drug case is given his freedom in exchange for cooperation and property.[0] See Mitchell, 472 U.S. at 521 ("First, in deciding whether officials performing a particular function are entitled to absolute immunity, we have generally looked for a historical or common-law basis for the immunity in question."). We reach this conclusion because, contrary to Bissell's position, we do not view his approval of the transaction with Giuffre as analogous to an in rem civil forfeiture.

In Schrob I, we held that a prosecutor's initiation of an in rem civil proceeding for the forfeiture of criminal property was absolutely immune because it was "intimately connected with the criminal process," and because an owner of the property would have sufficient opportunity to challenge the legality of the proceeding. 948 F.2d at 1411-12. Here, the transaction with Giuffre was never memorialized in writing, in accordance with the policy of Bissell's office, and was thereby designed to remain beyond judicial oversight. Consequently,

---

[0] See supra note 2.

while the ultimate result of the agreement with Giuffre may have been the forfeiture of his property, we are not presented here with an in rem proceeding and its attendant safeguards.

Rather, we view Prosecutor Bissell's act of advising Chief Thornburg during the challenged forfeiture negotiations as the functional equivalent of a prosecutor providing legal advice to police during the investigative stages of a criminal proceeding, an act which is not absolutely immunized from liability. Burns v. Reed, 500 U.S. at 496. In Burns v. Reed, the Supreme Court determined that there was no historical or common-law support for extending absolute immunity to a prosecutor's act of counseling police that hypnosis was an acceptable investigative technique in questioning a mother suspected of attempting to kill her two sons. While we are cognizant of the factual distinctions between the instant case, where Giuffre was under arrest by the Prosecutor's Office, and Burns v. Reed, where police were questioning an unarrested suspect, we believe that the rationale of the Court in that case applies with equal force here.

Burns v. Reed rejected any notion that giving legal advice to investigators is related to a prosecutor's role in screening cases for prosecution and in safeguarding the fairness of the criminal judicial process. The Court reasoned that:

> Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. . . . Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate

> decision whether to prosecute, but we have never
> indicated that absolute immunity is that expansive.

Id. at 495. That reasoning, which we believe applicable here, was reaffirmed by the Court in Buckley v. Fitzsimmons, 113 S. Ct. at 2617 ("When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is the same.").

Bissell also has failed to demonstrate a risk of vexatious litigation that would not be alleviated by the norm of qualified immunity. See Burns v. Reed, 500 U.S. at 494 ("Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation."); see also Mitchell, 521 U.S. at 511 (noting the "obvious risks of entanglement in vexatious litigation" that arise from "the judicial or 'quasi-judicial' tasks that have been the primary wellsprings of absolute immunity"). Nor has Bissell presented us with any alternative means apart from the instant action for redressing the wrongful conduct alleged here by Giuffre. See Mitchell, 472 U.S. at 522 ("[M]ost of the officials who are entitled to absolute immunity from liability are subject to other checks to help to prevent abuses of authority from going unredressed.").

Because Giuffre was never formally charged with any crime, he cannot seek redress through the criminal process for the wrongful conduct he attributes to Prosecutor Bissell. Nor, as we have just discussed, are there any safeguards of the judicial process -- apart from the instant action -- to serve as

a restraint on the type of prosecutorial misconduct alleged by Giuffre.  See  Burns v. Reed, 500 U.S. at 492 ("'[T]he safeguards built into the judicial system tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct.'") (citation omitted); Mitchell, 472 U.S. at 522-23 ("[T]he judicial process is largely self-correcting:  procedural rules, appeals, and the possibility of collateral challenges obviate the need for damages actions to prevent unjust results.").

Prosecutor Bissell thus has failed to carry his burden of establishing that he was functioning as an "advocate" when he directed Chief Thornburg to question Giuffre concerning his future cooperation with investigators, or when he counseled Thornburg to ensure that illegal proceeds had been used in the purchase of Giuffre's building lots, all for the alleged purpose of acquiring property and allowing Giuffre to avoid the judicial process entirely.  Those actions "have no functional tie to the judicial process," and are not entitled to absolute immunity merely because they were actions undertaken by a prosecutor.  See Buckley, 113 S. Ct. at 2618.

We hold, therefore, that Prosecutor Bissell is not entitled to absolute immunity, and that he is, at most, entitled to qualified immunity for his actions.  Our decision is informed by the teaching of the Supreme Court that we must be "'quite sparing'" in recognizing absolute prosecutorial immunity.  Id. at 2613 (citation omitted).

V.

The denial of qualified immunity is an issue of law, also subject to our plenary review.  As the Supreme Court has counseled:

> Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suits on its merits.  One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.

Siegert v. Gilley, 500 U.S. at 232.

In determining whether a government official is entitled to qualified immunity, we must apply the two-part, objective test enunciated by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982):

> government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Id.; see Abdul-Akbar, 4 F.3d at 201; Burns v. County of Cambria, 971 F.2d at 1021.  The "clearly established" standard of Harlow was delineated by the Supreme Court in Anderson v. Creighton, 483 U.S. 635, 640 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

<u>Id.</u>

This inquiry requires a threshold determination of whether the constitutional rights asserted by the plaintiff were "clearly established" at the time the defendant officials acted, and whether the plaintiff "has asserted a violation of a constitutional right at all.'" <u>Acierno</u>, ___ F.3d ___, 1994 WL 318783 at * 7 (slip op. at 17) (<u>quoting</u> <u>Siegert</u>, 500 U.S. at 232). As we discussed above in deciding the jurisdictional issues, the district court never determined whether Giuffre asserted a violation of a constitutional right, let alone a "clearly established" right. The court's entire discussion of qualified immunity was:

> Finally, the individual Defendants argue that they are entitled to qualified immunity. In <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987), the Supreme Court reaffirmed that the test for qualified immunity is based on objective reasonableness -- "whether a reasonable officer could have believed [the challenged action] to be lawful, in light of clearly established law and the information the [] officers possessed." <u>Id.</u> at 641. Plaintiff asserts that Defendants Leffert, Meyers, and DeBella repeatedly denied him the right to counsel, and that Defendants Smith, Thornburg, and Bissell also denied him counsel and unlawfully took his property without due process of law. The Court finds that whether Defendant violated any clearly established laws constitutes a genuine issue of material fact.

Dist. Ct. Op. at 8.

In reviewing the district court's order denying qualified immunity, we thus must determine whether "'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that

their conduct would be unlawful.'" Abdul-Akbar, 4 F.3d at 202 (quoting Good v. Dauphin County Social Servs. for Children and Youth, 891 F.2d 1087, 1092 (3d Cir 1989)). Where appropriate, we may consider whether the constitutional rights asserted by Giuffre were "clearly established" at the time the individual officials acted, without initially deciding whether a constitutional violation was alleged at all. See Acierno, F.3d ___, 1994 WL at * 23 n.7 (slip op. at 17 n.7); Rappa v. New Castle County, 18 F.3d 1043, 1077-79 (3d Cir. 1994); Abdul-Akbar v. Watson, 4 F.3d 195, 201-05 (3d Cir. 1993). As we stated in Good, "[t]he ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officers in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." 891 F.2d at 1092. We note that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); Schrob I, 948 F.2d at 1421.

A.

Giuffre alleges that his Fifth Amendment right to counsel was violated when he gave a taped statement to Sergeant Meyers and Detectives Leffert and DeBella during the custodial interrogation following his arrest on May 10, 1990. We disagree.

Giuffre concedes, as he must, that violations of the prophylactic Miranda procedures do not amount to violations of the Constitution itself. Giuffre br. at 26; see, e.g., Warren v. City of Lincoln, 864 F.2d 1436, 1442 (8th Cir.) (holding that

"the remedy for a Miranda violation is the exclusion from evidence of any compelled self-incrimination, not a section 1983 action"), cert. denied, 490 U.S. 1091 (1989); Bennett v. Passic, 545 F.2d 1260, 1263 (10th Cir. 1976) ("No rational argument can be made in support of the notion that the failure to give Miranda warnings subjects a police officer to liability under the Civil Rights Act").  The right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution, whereas the "right to counsel" during custodial interrogation recognized in Miranda v. Arizona, 384 U.S. 436 (1966), is merely a procedural safeguard, and not a substantive right.  Id.

Giuffre contends, however, that the alleged conduct of Sergeant Meyers and Detectives Leffert and DeBella reached beyond Miranda and touched upon his substantive Fifth Amendment rights. His argument is that, although he was advised of, and waived, his Miranda rights, "Mirandizing was a farce" because the individual officers never intended to allow him to exercise his right to remain silent.  Giuffre br. at 30.  Relying exclusively on the Ninth Circuit's en banc opinion in Cooper v. Dupnik, 963 F.2d 1220 (9th Cir.), cert. denied, 113 S. Ct. 407 (1992), Giuffre asserts that the Fifth Amendment violation alleged here sustains his § 1983 action against the individual officials.

Giuffre's reliance on Cooper is misplaced.  The majority in Cooper broke new ground when it held, in 1992, that a § 1983 claim for violation of the Fifth Amendment self-incrimination clause was stated by allegations that the

plaintiff's statements were compelled, even though those statements were never used against the plaintiff in a court of law. 963 F.2d at 1242-43. The dissenting judges in Cooper presented a persuasive argument that the Fifth Amendment privilege against self incrimination is not violated until evidence is admitted in a criminal case. See 963 F.2d at 1253-55 (Brunetti, J., dissenting); id. at 1256-57 (Leavy, J., dissenting). This disagreement, and subsequent opinions of other courts of appeal, indicate to us that the law on which Giuffre relies is not clearly established at this time. Wiley v. Doory, 14 F.3d 993, 997-98 (4th Cir. 1994) (holding that "law not clearly established even at time of the Cooper decision" and "remains unsettled" today); see also Mahoney v. Kesery, 976 F.2d 1054, 1062 (7th Cir. 1992) (declining to decide whether view of en banc Ninth Circuit in Cooper "is sound"). If the law on which Giuffre pins his claims is not presently clear, it could not have been clearly established in 1990 when Giuffre's Fifth Amendment violations were alleged to have occurred.

Furthermore, Cooper was decided under a highly-unusual set of facts. The defendant law enforcement officers there admitted that they engaged in a pre-existing interrogation plan whereby they ignored the suspect's repeated requests to speak with an attorney, deliberately infringed on his right to remain silent, and relentlessly interrogated him in an attempt to extract a confession. 963 F.2d at 1223-32. In contrast, Giuffre has not alleged, nor have any of the appellant officials admitted, the application of a pre-existing plan to interrogate

him in such a manner as to touch upon his substantive Fifth Amendment rights.

In light of the law as it existed at the time of the alleged Fifth Amendment violation, and as it exists today, we cannot say that a reasonable officer would have known that the conduct alleged here violated Giuffre's substantive rights under the Fifth Amendment, even though the officer might have recognized that the conduct could have been the basis for the suppression of Giuffre's statement. Because the substantive Fifth Amendment norms allegedly violated by the individual officials were not clearly established at the time of the challenged actions, Giuffre's claims based on violation of his Fifth Amendment right must fail. Accordingly, Sergeant Meyers and Detectives Leffert and DeBella are entitled to qualified immunity on Giuffre's Fifth Amendment claims.


B.

Prosecutor Bissell, Chief Thornburg, and Deputy Chief Smith also are entitled to partial summary judgment on Giuffre's claims that their denial of his right to counsel during the May 11, 1990 negotiations violated his rights under the Sixth Amendment. Giuffre's Sixth Amendment right to counsel had not attached at the time of the challenged actions of Bissell, Thornburg, and Smith.

It is settled law that the Sixth Amendment right to counsel does not attach until the "initiation of adversary judicial proceedings," Michigan v. Jackson, 475 U.S. 625, 629

(1986), by way of any formal charge, preliminary hearing, indictment, information, or arraignment. Brewer v. Williams, 430 U.S. 387, 398 (1977); Kirby v. Illinois, 406 U.S. 682, 689 (1972). Giuffre was never formally charged with the drug offenses, and his only appearance in court resulted in a postponement to allow him time to retain counsel.

We do not believe, as Giuffre urges, that his informal transaction with the Prosecutor's Office can properly be analogized to the formality of the plea bargaining process in which the result is ultimately submitted to the court. Compare Santobello v. New York, 404 U.S. 257, 260-61 (1971) (vacating judgment of conviction and sentencing of defendant whose formal plea agreement was not honored by prosecutor). Furthermore, we have held that the remedy for the failure to provide an accused with the benefit of counsel during plea bargaining is withdrawal of the guilty plea without inquiry into whether demonstrable harm resulted. Gallarelli v. United States, 441 F.2d 1402, 1405 (3d Cir. 1971) ("[T]he guidance of counsel is so essential a protection for an accused during plea bargaining and in the making of a decision to plead guilty that a plea entered without such guidance must be set aside.").

We therefore are not persuaded by Giuffre's argument that his transaction with the appellant officials was a plea bargain agreement. It is true that in rem proceedings for the forfeiture of criminal property are "intimately connected with the criminal process," Schrob I, 948 F.2d at 1411-12, and that a defendant has a right to the assistance of counsel during plea

negotiations.  See Gallarelli, 441 F.2d at 1405.  Those principles, however, do not amount to a Sixth Amendment violation in the instant case.  That is because, as the officials contend, these negotiations were not focused on a guilty plea, but rather on a dismissal of the charges and a forfeiture of Giuffre's building lots.

Since Giuffre was never formally charged, never indicted or arraigned, never appeared at a preliminary hearing, and never entered a guilty plea, his Sixth Amendment right to counsel never attached.  Giuffre therefore had no "clearly established" right that could have been violated by the actions of the individual officials under the Sixth Amendment.  That being so, reasonable officials in the situation alleged here could not have known that their actions violated Giuffre's "clearly established" Sixth Amendment right to counsel. Accordingly,  Bissell, Thornburg, and Smith are entitled to qualified immunity with respect to Giuffre's claims premised on a violation of the Sixth Amendment.

C.

Giuffre also alleges violations of his rights to substantive and procedural due process under the Fourteenth Amendment.

We may readily dispose of Giuffre's procedural due process claim because Giuffre has failed to allege a violation of clearly established federal law.  His argument is predicated on an alleged violation of the procedures established under New

Jersey law governing civil forfeiture.  See N.J.S.A. 2C:64-1, et seq.[0]  Violations of state law, however, are insufficient to state a claim under § 1983.  Kulwicki, 969 F.2d at 1468.  To the extent that Giuffre claims his procedural due process rights were violated in the forfeiture negotiations, he has failed to allege any violation of the United States Constitution.  We thus hold that Prosecutor Bissell, Chief Thornburg, and Deputy Chief Smith are entitled to qualified immunity as to any claim asserted by Giuffre that alleges a violation of procedural due process under the Fourteenth Amendment.

    With respect to Giuffre's substantive due process claim, the individual officials argue that there could have been no Fourteenth Amendment violation because they had the right to entertain an agreement whereby Giuffre forfeited the building lots in exchange for a dismissal of the criminal charges.  We disagree.  We believe that the conduct of the individual officials alleged by Giuffre is sufficiently conscience-shocking as to state a legally cognizable claim for a violation of substantive due process under the Fourteenth Amendment.  See Fagan v. City of Vineland, 22 F.3d 1296 (3d Cir. 1994) (in banc) ("[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'"); see also Collins v. City of Harker Heights, Tex., 112 S. Ct. 1061, 1069 (1992) (reaffirming "shock[s] the conscience" standard

---

[0]See supra note 1.

in civil damage actions for violations of substantive due process); Daniels v. Williams, 474 U.S. 327, 331 (1986) (the substantive component of the Due Process Clause "serves to prevent governmental power from being 'used for purposes of oppression'") (citation omitted).

The individual officials' arguments to the contrary are unpersuasive. They argue that, pursuant to application of the "relation-back doctrine," title to Giuffre's property vested with the State prior to any contact between them and Giuffre, and that they therefore cannot under any circumstances be deemed unlawfully to have deprived Giuffre of his property. However, the common law "relation back" doctrine, which is a fictional and retroactive vesting of title, is not self-executing; rather, it takes effect only upon the entry of a judicial order of forfeiture or condemnation. United States v. A Parcel of Land, Bldgs., Appurtenances & Improvements, 113 S.Ct. 1126, 1135 (1993) (Opinion of Stevens, J.), affirming 937 F.2d 98 (3d Cir. 1991). That doctrine is intended to protect the property rights of innocent purchasers of forfeited land, see 937 F.2d at 102-103; it does not shield public officials from any possible liability for a coercive and fraudulent forfeiture of property such as Giuffre alleges here.

The individual officials further contend that their conduct, even if unlawful, could not have deprived Giuffre of his property in violation of the Fourteenth Amendment because their actions had "no legal effect upon the forfeiture of [Giuffre's] property." County br. at 35. That argument merely begs the

question of whether or not the property legally vested in the County in the first place. We believe that the actions of the individual officials certainly would have had a "legal effect" on the forfeiture if, as Giuffre alleges, the subject lots were not purchased with illegal drug proceeds, and the officials, knowing that to be so, coerced Giuffre into making a false statement to facilitate forfeiture of the lots pursuant to N.J.S.A. 2C:64-1 et seq. Without any independent, untainted evidence of record that illegal drug proceeds were, in fact, used to purchase the lots, the voluntariness of Giuffre's written statement to that effect is of paramount importance in deciding whether Giuffre was deprived of his property without due process of law. We cannot determine that factual question in this interlocutory appeal.

The individual officials, in any event, do not appear to challenge the principle that a showing of coercive conduct through threats and intimidation in order to induce a suspect to make a statement would constitute a violation of Giuffre's right of substantive due process of law guaranteed by the Fourteenth Amendment. Rather, the essence of their argument is that they did not do what Giuffre alleges they did. Their "I didn't do it" defense to Giuffre's substantive Fourteenth Amendment claim is not cognizable as a declaration of qualified immunity. Burns v. County of Cambria, 971 F.2d at 1019. As Judge Easterbrook reasoned in Elliott v. Thomas, 937 F.2d 338 (7th Cir. 1991), cert. denied, 112 S. Ct. 1242 (1992): "[T]here is no separate 'right not to be tried' on the question whether the defendants did the deeds alleged; that is precisely the question for trial.

. . . It is impossible to know which 'clearly established' rules of law to consult unless you know what is going on."  Id. at 341.

Hence, we have no jurisdiction to determine whether the district court properly denied the summary judgment motion of the individual officials on any of Giuffre's claim predicated on violations of his substantive right of due process of law under the Fourteenth Amendment.  Burns v. County of Cambria, 971 F.2d at 1019 (declining to exercise jurisdiction over appeals of defendant officials who had rested their case on the mere denial that the conduct alleged by the plaintiffs had occurred); Ryan v. Burlington County, N.J., 860 F.2d 1199, 1203 n.8 (3d Cir. 1988) (noting that court will not exercise jurisdiction where "I didn't do it" defense merely refutes plaintiff's case-in-chief), cert. denied, 490 U.S. 1020 (1989); see also Abdul-Akbar, 4 F.3d at 201 (noting that the question of qualified immunity often cannot be resolved adequately until dispositive facts have been presented at trial and reduced to findings).

Because genuine issues of material fact remain concerning  alleged violations of Giuffre's right of substantive due process, requiring development of a factual record at trial, we may not entertain the officials' appeal of the district court's order as it relates to the denial of immunity for the substantive claims under the Fourteenth Amendment.

## V.

Accordingly, we will affirm that portion of the district court's July 29, 1993 order denying Prosecutor Bissell absolute immunity. However, we will reverse the July 29, 1993 order of the district court to the extent that it denies the individual officials qualified immunity from suit on any of Giuffre's claims alleging violations of the Fifth and Sixth Amendments and violations of procedural due process under the Fourteenth Amendment. We will remand that portion of the district court's order with the direction that the district court enter partial summary judgment for the individual officials on only those claims. We dismiss the remainder of the appeal for lack of appellate jurisdiction, and remand to the district court for further proceedings consistent with the foregoing opinion.