Robert OLENDER

v.

TOWNSHIP OF BENSALEM, et al.

No. Civ.A. 96–8117.

United States District Court,
E.D. Pennsylvania.

Jan. 5, 1999.

David J. Juall, Chalfont, PA, Jay M. London, Daniel M. Brown, Philadelphia, PA, for plaintiff.

Peggy Greenfeld, Joseph Goldberg, James M. Prahler, Lawrence J. Bunis, Donald M. Davis, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Robert Olender brings this action under 42 U.S.C. §§ 1983 and 1986 against the Township of Bensalem, Bensalem Police Captain Jack Robinson, and Bensalem Police Detectives David Rouland, Timothy Carroll, and John Knowles. Olender alleges violations of his rights under Article IV of the Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution. His complaint is based on events, beginning in November 1994, which resulted in Olender's being charged with, tried for, and ultimately found not guilty of, prostitution and promoting prostitution, hindering apprehension or prosecution, and conspiracy. Based on the same facts, Olender also brings state tort claims against the individual defendants for false arrest and false imprisonment, malicious prosecution, and intentional infliction of emotional distress.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Defendants have moved for summary judgment, arguing that all of Olender's claims fail as a matter of law. In addition, the individual defendants assert that they are protected by qualified immunity on the constitutional claims, and immunity under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8541, et. seq., on the state law claims. I will grant Defendants' motion with respect to all claims for all remaining defendants.[1]

## I. Background

The facts as set forth are taken from the record before me, which consist primarily of deposition testimony and Detective Rouland's Affidavit of Probable Cause, dated January 27, 1995.[2] I have adopted Plaintiff's version of the facts when there are disparities.[3] Plaintiff Robert Olender and his wife own a property at 568 Bristol Pike in Bensalem Township. In November 1993, they leased the to Robert Shockey, who ran a business called the Monterey Bay Photo Company on the premises. On November 10, 1994, the Bensalem Township Police Department received information that a house of prostitution might be operating at 568 Bristol Pike, and that same day, Detective Rouland began surveillance of the property. He followed and stopped a male leaving the premises, and questioned him on what took place inside. The man stated that he had just had a "B & D" session, in which, for $175, a woman whipped him, then watched him as he masturbated. The next day, November 11, Detective Rouland and a second Detective, named Berry, were watching 568 Bristol Pike. Again, they followed a man as he left the building, and questioned him. That man told the detectives that he had just received a massage in which the female masseuse masturbated him. That evening, Detectives Rouland and Berry, were back watching the property. At some point, Shockey came out of the building and asked the detectives to identify themselves. Shockey heard them identify themselves as "Roland" and "Berry," but the detectives would not indicate whether or not they were police officers. Shockey returned to the building and called Olender.

In that call, Shockey told Olender of his conversation with "Roland" and "Barry," and indicated that he wanted to find out if the two individuals were police officers or "vigilantes." Olender, who is a photographer, had taken portraits of most of the Township's police officers for a public service program, and in response to Shockey's call, went to 568 Bristol Pike, taking with him a poster containing the portraits of approximately fifty officers. Shockey could not identify "Roland" or "Barry" from that poster. Olender then called the police station for information on "Roland" and "Berry," and was told that there were two Bensalem detectives named Rouland and Barry. Olender then went out to where Rouland and Berry were positioned, identified himself, and invited them in to inspect the premises. The detectives declined and left the area.

Prior to the investigation by Defendant Rouland, Defendant Carroll had been investigating the activities at 568 Bristol Pike. On August 30, 1994, he had gone there undercover and received a massage, during which the masseuse asked him if he wanted her to

---

1. There were two additional defendants when this action was initially filed, however, by order dated May 2, 1997, I dismissed all counts against Bucks County District Attorney Alan Rubenstein and Assistant District Attorney Troy Leitzel.

2. The Affidavit of Probable Cause ("Prob. Cause Aff.") is found at Exhibit G to Defendant's Motion for Summary Judgment ("Def's Mot.Summ. J.").

3. Plaintiff makes it difficult to reconstruct his version of the events. First, Plaintiff's Memorandum of Law in Support of his Response to the Motion for Summary Judgment ("Pl's Resp.") contains no page numbers: citations to specific pages in his brief are based on my own count of the pages. Second, when pointing to the record to support his version of the events at issue, plaintiff has often not been sufficiently specific. For example, he frequently asserts a fact, and provides a citation in support such as "Exhibit A," or "Exhibit C," or "Exhibit E," ("Exhibit A" is a Olender's 256 page deposition, and "Exhibit C" is the 42 page deposition of John Knowles, and "Exhibit E" is the 61 page deposition of David Rouland), but gives no page designation, leaving it for me to search for and try to guess to what testimony plaintiff was referring. Where appropriate, I have refused to take steps necessary to pinpoint specific facts.

perform a "hand release" (a genital massage to cause ejaculation). On November 14, 1994, Carroll again went to the building, and was told by the masseuse that he couldn't get a "hand release" because "the neighbors have been stopping people when they leave." That same day, the police caused a search warrant to issue for the property. The police gathered evidence, including costumes, whips, masks, leather garments, restraints, paddles, a coffin, handcuffs, and a prayer alter, and took three female employees to police headquarters for questioning. In their search, the police also recovered the poster of the police officers that Olender had taken to Shockey three days earlier, and a photograph of another Bensalem Police Officer, Greg Young. Olender later told Detective Rouland that he had taken the picture of Officer Young over to Shockey to demonstrate a photographic technique.

One of the women taken in by the police on November 14 was Nicole Peckham. At the police station, Ms. Peckham was questioned by Defendant Knowles. At one point during the interview, Rouland briefly entered the room. Peckham later testified at Olender's trial that Rouland, who is "the brother-in-law of Peckham's son's father (by marriage)," threatened to have Peckham's son taken from her if she did not cooperate with the investigation. During the questioning, Knowles asked Peckham whether she knew Olender, or if she knew the landlord. She replied that she didn't know anyone name Olender, and didn't know the landlord. Knowles then said that Olender drives a white Jeep, and asked if she knew the guy who drove a white Jeep. Peckham replied that she knew a guy who drove a white Jeep, who met often with Shockey, but that she didn't know him as either Olender or the landlord. Peckham then added that the guy in the white Jeep was used as a "model," during a massage training session, but that the massage was non-sexual.[4]

On November 16, Olender went to the police station, on assignment from his employer Associated Press, to get access passes to an unrelated crime scene from Defendant Captain Robinson. After getting the passes and finishing with Robinson, Olender was asked by Detectives Rouland and Knowles if he would speak to them, and Olender agreed, and the three men went into a small office at the station. Their discussion centered on the activities at 568 Bristol Pike, and Olender's knowledge of what was taking place there. During this discussion, Rouland repeatedly attempted to get Olender to admit that he knew what was going on there and informed Olender that he could be charged with "facilitating prostitution" because he was the landlord and should have known what was going on. Olender was upset by Rouland's questions and statements, and responded that he did not know what was going on at 568 Bristol Pike or what "facilitating prostitution" was, and stated that he would sue Rouland if Rouland attempted to arrest or charge him. After Rouland informed Olender that he could be charged with prostitution, Olender said "Wow, I better get my lawyer." Rouland replied "[Y]ou'd better talk to your lawyer about that," but the interview did not end. Olender attempted to leave during this conversation, but was prevented from doing so, because Rouland's chair blocked the door, and each time Olender stood up to leave, Rouland told him to sit down and calm down. The interview lasted about one and one-half hours. At approximately 10:00 pm, Olender left the police station and went to the Associated Press office to hand in the passes he had obtained from Captain Robinson.

The next morning, Olender met with his attorney. Upon leaving his attorney's office, Olender saw Rouland on the street and waved to him. Rouland pulled over and Olender said words to the effect of "I guess you got me, I'm guilty for facilitating this prostitution. I spoke to my lawyer today and he told me that the law is changed. He found a new case and told me that sadomasochistic sex is illegal." Olender further told Rouland that his lawyer advised that it was a low-grade misdemeanor, and that Olender would only have to pay a fine. Olender then told

4. Peckham was released on November 15, 1994 without being charged. She was later charged with prostitution, and was placed on Accelerated Rehabilitative Disposition ("ARD") on April 17, 1995.

Rouland, "Let's go over to Judge Brown's office and I can pay my fine." Rouland did not take any action at this time, and indicated to Olender that it was no big deal, and "they might not do anything about it."

On or about December 9, 1994, Rouland signed an affidavit of probable cause, requesting that an arrest warrant be issued against Olender. Among other facts, Rouland's affidavit related that, on November 16, Olender told Rouland that he had been suspicious of the activities at 568 Bristol Pike. In addition the affidavit included Ms. Peckham's identification of Olender as the model at the massage training session. Also on December 9, Rouland and Carroll signed a criminal complaint against Olender, charging him with prostitution and promoting prostitution, and hindering apprehension and prosecution. Olender was arraigned before District Justice Leonard J. Brown on December 9, 1994 and pled "not guilty." On Monday, December 12, Nicole Peckham was arraigned, and Olender was present at her arraignment. When Peckham was introduced to Olender that day, she realized that she had misidentified him to Knowles on November 14 as the man in the white Jeep, and the massage "model."

On January 25, 1995, a preliminary hearing was conducted by District Justice Brown. The only evidence offered against Olender was Defendant Carroll's testimony regarding Carroll's undercover activities at Monterey in August and November, and the statements made to Detective Carroll about the availability of "hand releases." District Justice Brown held that Carroll's testimony was inadmissible hearsay. The Commonwealth asked for a continuance in order to present additional witnesses and evidence, but District Justice Brown denied that request and dismissed the case without prejudice to the Commonwealth's right to refile charges against Olender. Ms. Peckham was present for this hearing, and informed the Assistant District Attorney handling Olender's case, Troy Leitzel, that she had incorrectly identified Olender on November 14 as the massage model. Rouland became aware of Peckham's recantation that same day.

Two days later, on January 27, 1995, Rouland and Carroll again swore out a criminal complaint against Olender before District Justice Brown. In support of the complaint, Rouland presented an exact copy of the probable cause affidavit he had submitted on December 9, 1994, which included Ms. Peckham's now-recanted identification. This second criminal complaint added a third charge against Olender for conspiracy. Also on January 27, District Attorney Alan Rubenstein phoned Olender's attorney and informed him of the filing of the amended criminal complaint. On February 2, Rubenstein filed a petition to secure a new issuing authority and requested a Common Pleas Judge to appoint an alternate District Justice to sit at the preliminary hearing. Common Pleas Judge Garb appointed District Justice John Kelly to handle this second preliminary hearing, which was held on March 16, 1995. Following this preliminary hearing District Justice Kelly held Olender over for trial.

In June 1995, Olender went to trial before the Honorable Ward F. Clark. Prior to trial, Olender filed a motion to dismiss the charges, suppress the warrant executed at 568 Bristol Pike, and to suppress Rouland's report of his November 16, 1994 interview with Olender. Judge Clark denied all three motions. On June 26 trial began, and after the prosecution presented all of its evidence, Olender filed for a demurrer all counts, which was denied after a hearing. The entire case was submitted to a jury, which returned a verdict of not guilty on all counts.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of

a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party does not bear the burden of persuasion at trial, as is the case here, its burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading," *id.,* but must support its response with affidavits, depositions. answers to interrogatories, or admissions on file. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990).

To determine whether summary judgment is appropriate, I must determine whether any genuine issue of material fact exists. An issue is "material" only if the dispute "might affect the outcome of the suit under the governing law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See id.* The standard thus "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)." *Id.* 477 U.S. at 250, 106 S.Ct. 2505. If the evidence favoring the nonmoving party is "merely colorable," "not significantly probative," or amounts to only a "scintilla," summary judgment may be granted. *See id.* 477 U.S. at 249–50, 252, 106 S.Ct. 2505; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Of course, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992). Moreover, the "evidence

of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Big Apple BMW, Inc.,* 974 F.2d at 1363. Thus, my inquiry at the summary judgment stage is only the "threshold inquiry of determining whether there is the need for a trial," that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505.

## III. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

In order to bring a successful § 1983 claim, a plaintiff must demonstrate (1) that the challenged conduct was committed by a person acting under color of state law, and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or federal law. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255–56 (3d Cir.1994); *Carter v. City of Philadelphia,* 989 F.2d 117, 119 (3d Cir.1993). Olender makes the following claims against each of the defendants under § 1983: denial of his right of access to the courts; violating his right to be free from unreasonable search and seizure; denial of his right to counsel when being questioned by police.

## IV. Claims Against the Township of Bensalem

In § 1983 cases, municipal liability attaches when "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Monell v. Department*

of *Social Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (*"Canton"*), the Supreme Court expounded upon *Monell,* holding that the inadequacy of police training may serve as the basis for § 1983 liability only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* 489 U.S. at 388, 109 S.Ct. 1197. Integrating *Canton* with *Monell,* the Court explained that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* 489 U.S. at 389, 109 S.Ct. 1197. Evidence of knowledge and acquiescence by high level policy-makers may establish a custom, *Fletcher v. O'Donnell,* 867 F.2d 791, 793 (3d Cir.1989), however, proof of a single incident by lower level employees does not suffice to establish either an official policy or custom, *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Finally, a plaintiff must show an "affirmative link" between the occurrence of the alleged misconduct and the municipality's policy or custom, *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

■ Olender alleges that, under § 1983, the Township of Bensalem ("Township") is responsible for violating his rights under Article IV, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution. Count I of his Complaint alleges that the Township "has maintained an inadequate system of training and review of their police officers, agents, servants and/or employees, which systems have failed to identify instances of improper investigation procedures, failed to discipline their police officers, failed to closely supervise or retrain officers ... and failed to provide Plaintiff information which should have been provided to him." Complaint ¶ 62. In the next paragraph, he lists four specific deficiencies in the Township's training and supervision of officers, based on his "information and belief." *Id.* ¶ 63. In Count II he states that the Township "has been deliberately indifferent to a pattern and practice of abuse of police power." *Id.* ¶ 69.

In moving for summary judgment on all claims against it, the Township states that Olender has failed to adduce any evidence whatsoever that a policy maker in the Township had knowledge of a pattern or practice of inadequate training or discipline of officers, as alleged in the complaint, or any other evidence of a policy or custom of the Township in this regard. In his response to Defendants' motion, Olender does not point to any evidence of that the Township has such a policy or custom, he merely makes the conclusory statement that, "As the Township was the employer of these individuals, the Township is liable for the alleged unconstitutional policy, custom and failure to train. The Township is responsible to train it employees, and the actions perpetrated by the defendants is indicia of Township's culpability." Pl's. Response at 25. Olender has produced no probative evidence concerning the nature and quality of the Bensalem Township Police Department's present training program or disciplinary system. *Monell* made clear that "a municipality cannot be held liable solely because it employs a tortfeasor." *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; *see also Montgomery v. De Simone,* 159 F.3d 120, 127 (3d Cir.1998) ("To the extent that [Plaintiff's] claims are based upon a respondeat superior theory, they are barred under *Monell.*"). By pointing to the absence of supporting evidence in the record to support this claim, the Township has met its burden under *Celotex* on this issue, and I will grant summary judgment in favor of the Township.

## V. Qualified Immunity

■ The individual defendants argue that they are shielded from liability by qualified immunity on all of the constitutional claims brought against them under § 1983. "As government officials engaged in discretionary functions, [d]efendants are qualifiedly immune from suits brought against them for damages under section 1983, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherwood v. Mulvihill,* 113 F.3d 396, 398–99

(3d Cir.1997) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Thus, *Harlow* provides the court with an objective standard against which to measure the official's actions. When applying this objective standard, the court must resolve two issues: (1) Has the plaintiff stated a violation of a constitutional or federal statutory right? *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); and (2) If so, was that right clearly established, i.e., were the "contours of the right ... sufficiently clear that a reasonable official would understand that what [he or she] is doing violates that right"? *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). By directing courts to examine the "contours of the right" at issue, *Anderson* requires that the court compare the facts alleged with the facts in prior cases, decided before the official acted. If the facts closely correspond to prior decided cases, then the official should have been on notice that his or her conduct was unconstitutional. If the facts present a novel and colorable question as to the correct application of the law, the official will be protected by qualified immunity.

■■■■ The policy behind qualified immunity is to weed out those claims that clearly lack merit as early as possible in the litigation process. *See Harlow,* 457 U.S. at 814, 102 S.Ct. 2727. Defendants are encouraged to raise the qualified immunity defense in a motion to dismiss, which must be ruled upon immediately by the court. If that motion is denied, an appeal is permitted. The purpose is to enhance the opportunity for public officials to devote their time and efforts towards performing their public service obligations rather than becoming bogged down in trials and depositions. *See id.* 457 U.S. at 814–16, 102 S.Ct. 2727. Thus, the proper order of analysis when a qualified immunity defense has been interposed, is to address the qualified immunity issue first. I will do just that.

## A. The Defense of Qualified Immunity With Regard to the Claims Against Captain Robinson

■■■■ The first prong of the qualified immunity analysis is to ascertain whether the plaintiff has stated that the defendant has violated a federal constitutional or statutory right of the plaintiff. Liability under § 1983 cannot be imposed vicariously or under the grounds of respondeat superior. *Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976); *see also Colburn v. Upper Darby Township,* 838 F.2d 663, 673 (3d Cir.1988) (police commissioner and mayor dismissed because complaint did not allege either was personally involved in any activity related to the suit). A § 1983 defendant's conduct must have a close causal connection to plaintiff's injury for liability to attach. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Allegations of participation or actual knowledge and acquiescence must be made with particularity, *Rode,* at 1207, and the mere fact that a defendant may hold a supervisory position is insufficient to find liability, *Wilson v. Horn,* 971 F.Supp. 943, 947 (E.D.Pa.1997).

Captain Robinson contends that Olender has failed to adequately state a claim against him, and that all of Oleander's claims against him should be dismissed. Robinson argued this same point in his motion to dismiss, claiming that "[n]ot a single allegation in the plaintiff's complaint asserts any specific conduct on Captain Robinson's part." Defs' Mot. to Dismiss (docket entry 5) at 6. Olender responded to that motion by pointing to Paragraph 36 of his complaint, which reads:

On November 16, 1994, Plaintiff, who had come to the Bensalem Township police station to speak with Defendant Robinson, while on assignment with his then employer Associated Press on an unrelated matter, was questioned by Defendants Rouland and Knowles.

Olender argued that this allegation raises a question of fact as to whether Robinson had contacted him to "set him up" for the questioning by Rouland and Knowles by calling Olender and having him come in to the station ostensibly to discuss an unrelated matter. The record on this matter has been amplified, and Olender now concedes that he went to the Bensalem Police Station on November 16, 1994, not at the request of Captain Robinson, but rather on instructions

from his employer, the Associated Press, to secure passes to an unrelated crime scene. Pl's Resp. at 4. There is no evidence in the record that Robinson took any action to "set Olender up" and it appears that Olender has abandoned this allegation.

■ Olender's claims against Robinson now rest entirely upon his contention that "Captain Robinson is the individual in charge of the detectives in Bensalem Township .... [and] was aware or should have been aware of the actions of those under his command concerning this investigation.... Captain Robinson supervised the detectives in this investigation, and therefore is culpable." *Id.* at 28. Because there is no respondeat superior theory of liability under § 1983, and there is no evidence that Robinson was personally involved in this matter, Olender has failed to state a claim that Robinson violated a constitutional or federal statutory right, *Siegert,* 500 U.S. at 232, 111 S.Ct. 1789, and I will grant summary judgment to Defendant Robinson on all counts.

## B. Constitutional Claims Against the Three Detective Defendants

Olender claims that all three of the remaining individual defendants, Detectives Carroll, Knowles and Rouland, who all served as detectives for the Township of Bensalem ("the Detective Defendants"), violated his constitutional right of access to the courts: his right to counsel, and his right to be free from unreasonable search and seizure. I will address each of these claims in turn.

### 1. Count I—Right of Access to the Courts

■ The right of access to the courts arises in a variety of contexts. In *Chambers v. Baltimore & Ohio R. Co.,* 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907), the Supreme Court stated that "[t]he right to sue and defend in the courts" was one of the privileges of citizenship guaranteed by the Constitution. The Court has also found a right of access to the courts encompassed within the First Amendment right to petition the government for redress of grievances. *See California Motor Transport Co. v. Trucking Un-*

*limited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In addition, there is a due process right under the Fourteenth Amendment, which precludes state actors "from preventing individuals from obtaining access to the civil courts." *Brown v. Grabowski,* 922 F.2d 1097, 1113 (3d Cir.1990) (*citing Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). This right of access to the courts "also comprehends a right to learn facts necessary to seek redress for constitutional violations of individual rights." *Id.* 922 F.2d at 1113 n. 10 (citing *Ryland v. Shapiro,* 708 F.2d .967, (5th Cir. 1983) (holding that state officers could be sued under § 1983 on the theory that they had withheld evidence and prevented a full investigation into the death of plaintiff's daughter, thereby preventing plaintiffs from pursuing a wrongful death action against the alleged killer, a local prosecutor)).

■ In Count I, Plaintiff claims that the Detective Defendants, "by not conducting a fair, impartial and thorough investigation, and threatening witness, Nicole Peckham, to implicate Plaintiff, the aforesaid perpetrators deprived Plaintiff ... of his constitutionally protected right of access to the courts and to petition for redress of grievance guaranteed by the Constitution of the United States and in violation of 42 U.S.C. §§ 1983, 1986, and 1988 as described in *Ryland v. Shapiro,* 708 F.2d 967 (5th Cir.1983)." Complaint ¶ 61.

The Detective Defendants acknowledge that state action which interferes with a private citizen's ability to institute a suit, or defend himself in court can be found to violate the right of access to the courts. However, they argue that Olender does not point to any fact in the record to support such a claim, under any of the theories set out above. Olender did not address any of the Detective Defendants' arguments on this claim in his response, and has failed to point to any evidence in the record that any of the Detective Defendants either: (1) withheld evidence and prevented him from pursuing a separate cause of action in court; or (2) hindered his defense in the underlying criminal proceeding. Olender has thus failed to meet his initial burden of establishing that the Detective Defendants' actions violated a

statutory or constitutional right, *Siegert,* 500 U.S. at 232, 111 S.Ct. 1789, and Defendants are entitled to summary judgment on Count I of the Complaint.

### 2. Count II—Fifth and Sixth Amendment Claims

In Count II of the Complaint, entitled "Unreasonable Search and Seizure, Right to Counsel," Olender alleges generally that several of his constitutional rights were violated by the Detective Defendants.[5] He never specifies, however, which facts underlay each specific alleged constitutional violation. The Detective Defendants have reasonably construed Count II to allege: (1) claims under the Fifth Amendment for failure to receive proper *Miranda* warnings, denial of his right to have questioning stopped when requested, and denial of his right to counsel during questioning; and (2) a claim under the Sixth Amendment for denial of his right to counsel. These claims are based upon Defendants Rouland and Knowles interview with Olender on November 16, 1994.[6] Plaintiff appears to acknowledge that the Defendants' have correctly interpreted his claim, and in response to Defendants' motion he did not offer any additional or alternative theories of liability based on the facts presented.[7] The Detective Defendants move for summary judgment on all claims allegedly arising under the Fifth and Sixth Amendments.

#### a. Claims Under the Fifth Amendment

There is no cause of action under § 1983 against police officers for failure to follow *Miranda* procedures, because "violations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution itself." *Giuffre v. Bissell,* 31 F.3d 1241, 1255 (3d Cir.1994). "The right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution, whereas the 'right to counsel' during custodial interrogation recognized in [*Miranda* ] is merely a procedural safeguard and not a substantive right." *Id.* 31 F.3d at 1256. *see also New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (defendant does not have a constitutional right to receive *Miranda* warnings because warnings are only a procedural safeguard designed to protect a person's right against self-incrimination); *Bennett v. Passic,* 545 F.2d 1260, 1263 (10th Cir.1976) ("No rational argument can be made in support of the notion that the failure to give *Miranda* warnings subjects a police officer to liability under the Civil Rights Act."); *Cronin v. West Whiteland Township,* 994 F.Supp. 595, 602–03 (E.D.Pa. 1998). "[T]he remedy for a *Miranda* violation is the exclusion from evidence of any compelled self-incrimination, not a section 1983 action." *Warren v. City of Lincoln,* 864 F.2d 1436, 1442 (8th Cir.1989). Therefore, as far as Olender's claims are construed to rest upon the fact that he was compelled to make

5. In the Count II, after incorporating the previous 63 paragraphs (setting forth the factual allegations and Count I) Olender generally claims:

> 67. The actions of the Defendants ... deprived Plaintiff of the equal protection of the law and his rights, privileges and immunities under the laws and the Constitutions of the United States and the Commonwealth of Pennsylvania; in particular his right to be free from unreasonable search and seizure, to be secure in his person and property, to due process and equal protection of the laws, and the right to counsel and to have questioning stopped when counsel is requested, all to Plaintiff's great detriment and loss.
> 68. By these actions, Defendants have deprived Plaintiff of the rights secured unto him by the Constitution of the United States, in particular, the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereof and in violation of 42 U.S.C. § 1983.

6. Plaintiff does not allege that Defendant Carroll took any part in the questioning of Plaintiff on November 16, 1998, accordingly, all of Olender's claims arising from this incident, are dismissed as to defendant Carroll.

7. In his response to Defendants' Motion for Summary Judgment on this issue, Plaintiff made no legal arguments. He merely states that he "was entitled to miranda [sic] warnings while in the custody of the defendants on November 16, 1994.... He asked several times to be free to leave the room ... but Rouland would not allow him to leave. Further [he] asked to have his attorney present, but this request was denied.... His statements were then utilized against him although they were reported inaccurately in the probable cause affidavit. Robert Olender was entitled to receive miranda [sic] warnings and have the right to counsel as set forth by the Constitution...." Pl's Resp. at 23–24.

statements to Detectives Rouland and Knowles, without being provided the proper procedural protections against self-incrimination, he fails to state a violation of a constitutional right, and his claim fails under the first prong of *Siegert.*

■ Olender's claim might possibly be construed to allege not merely the failure to provide *Miranda* warnings, but also a claim that the Detective Defendants' actions violated his substantive Fifth Amendment right against compelled self-incrimination. *See Giuffre v. Bissell,* 31 F.3d at 1256; *Cooper v. Dupnik,* 963 F.2d 1220, 1242–43 (9th Cir. 1992) (en banc). Such an argument might be that, on November 16, at the moment Detective Rouland allegedly coerced Olender into making incriminating statements, Rouland violated Olender's Fifth Amendment Rights. Even so construed, the Detective Defendants are protected by the second prong of the defense of qualified immunity, namely that the contours of the right claimed were not sufficiently clear so that a reasonable officer would have understood that what he or she was doing violated that right. In the *Giuffre* case, the plaintiff brought a § 1983 action against several officials alleging, among other claims, a violation of his substantive rights under the Fifth Amendment. Plaintiff alleged that a taped confession he gave was coerced because, although he was given *Miranda* warnings, his repeated requests to speak to his attorney were ignored or denied by the officials, and he was afraid that if he "tried to push that right that harm would come to [him]." *Id.* 31 F.3d at 1249. He further alleged that during almost three hours of questioning, the officers threatened that if he did not cooperate, they would lock up his girlfriend and take her handicapped son away, shoot plaintiff's dogs, and put him in jail "with a bunch of guys that believe [he] informed on them." *Id.* Even faced with this very aggressive interrogation, the *Giuffre* court held that the plaintiff could not maintain a suit under § 1983 for alleged violations of his Fifth Amendment rights—the defendants were protected by qualified immunity.

The Court stated that the law regarding when a substantive Fifth Amendment violation occurs was not clear and explained that there was disagreement among the circuits as to whether such a violation occurs at the moment a statement is compelled, citing *Cooper v. Dupnik,* or whether the violation occurs only when compelled evidence is admitted in a criminal case, citing the dissent in *Cooper* and subsequent opinions in other circuits. *Giuffre,* 31 F.3d at 1256. The *Giuffre* court concluded that:

> In light of the law as it existed at the time of the alleged Fifth Amendment violation, *and as it exists today,* we cannot say that a reasonable officer would have known that the conduct alleged here violated [plaintiff's] substantive rights under the Fifth Amendment, *even though the officer might have recognized that the conduct could have been the basis for the suppression of [plaintiff's] statement.*

*Id.* (emphasis added). The events at issue here took place approximately three and one-half months after the opinion in *Giuffre* was issued on August 4, 1994. Because no intervening caselaw existed between the *Giuffre* decision and November 16, 1994, the law was still unclear when Defendants Rouland and Knowles allegedly held Plaintiff in custody and interrogated him. Therefore, it would not have been unreasonable for Rouland and Knowles to believe that their conduct did not violate Olender's Fifth Amendment rights, and they are protected from liability by qualified immunity.

*b. Claims Under the Sixth Amendment*

■ Also in Count II, Olender obliquely alleges that his Sixth Amendment rights were violated at his November 16, 1994 questioning. The Detective Defendants argue that the Sixth Amendment right to counsel attaches at the time adversary judicial proceedings have been initiated by way of a formal charge, preliminary hearing, indictment, information or arraignment, citing *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The Detective Defendants correctly state the law on this point, *see Giuffre,* 31 F.3d at 1257, and *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), and point out that Olender has not alleged that formal charges had been initiated against him at the time of his questioning. Olender has not

responded to Defendant's legal argument on this point. Because at the time Olender was questioned by Rouland and Knowles no formal charges had been filed against him, he was at most a suspect. In this situation, Olender's right to counsel under the Sixth Amendment had not yet attached, and Olender has not stated a claim against Defendants Rouland or Knowles for violating his Sixth Amendment right.

Because the Defendants did not violate any constitutional right in failing to provide Plaintiff with *Miranda* warnings, or questioning him in the absence of counsel, and the law was not clearly established that defendant's were violating any substantive right under the Fifth amendment, I will grant summary judgment to defendants insofar as Plaintiff's Complaint is based upon violations of the Fifth Amendment. I will also grant summary judgment to defendants insofar as Plaintiff's complaint is based upon the violation of his Sixth Amendment right to counsel when he was interviewed on November 16, 1994.

### 3. Count II—Fourth Amendment Claims

The main focus of Olender's Complaint is that the Detective Defendants had no probable cause to arrest him, the first time on charges of prostitution and promoting prostitution, and hindering apprehension or prosecution, or subsequently on those charges plus the additional charge of conspiracy.[8] Olender asserts that the arrest was made due to a vendetta against him by Defendant Rouland, who made false statements and omissions in the thirteen-page probable cause affidavit submitted to District Justice Brown on December 9, 1994 and again on January 27, 1995. Again, I will first address the issue of qualified immunity as it relates to claims of arrest without probable cause.

■■■ The right to be free from arrest without probable cause is a "clearly estab-

lished right" under the Fourth Amendment which, if violated, would ordinarily survive a defense of qualified immunity. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir.1995). However, to challenge an affidavit of probable cause that is valid on its face, a plaintiff must show that (1) the affidavit contains intentional or recklessly false statements, and (2) the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *see also Sherwood v. Mulvihill*, 113 F.3d 396, 398–99 (3d Cir.1997) (applying *Franks* test to actions under § 1983); *Lippay v. Christos*, 996 F.2d 1490, 1501 (3d Cir.1993) (same). Probable cause to arrest exists if " 'at the moment the arrest was made . . . . the facts and circumstances within [defendants'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [plaintiff] had violated [the law]." *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Thus the initial burden faced by Olender in this case is to demonstrate that the affidavit, purged of its alleged falsities, does not support a finding of probable cause, as defined in *Hunter*.

■■■ However, because the Detective Defendants have raised the defense of qualified immunity, even if Olender could meet that initial burden, the Detective Defendants are not liable unless their belief that probable cause existed was objectively unreasonable. *Orsatti* 71 F.3d at 483 ("[O]nly where the warrant application is 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable,' will the officer lose the shield of immunity.") (*quoting Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). In determining the reasonableness of an officer's belief in

---

8. I am focusing on the second probable cause affidavit in this case because Olender's argument—that there was no probable cause to arrest him—may be stronger on this point. On January 25, 1995, at Olender's first preliminary hearing, Detective Rouland became aware that Ms. Peckham had recanted her identification of Olender

as the "model" for the massage training session. In spite of this knowledge, on January 27, Detective Rouland submitted an affidavit in support of probable cause, identical to the affidavit submitted in December, which stated that Peckham had identified Olender as the "model."

probable cause, the standard is "whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause." *Malley*, 475 U.S. at 341, 106 S.Ct. 1092. The standard set out in *Malley* "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Orsatti*, 71 F.3d at 480.

Olender does not challenge any statement in the probable cause affidavit concerning the sexual activities allegedly occurring at 568 Bristol Pike. Thus, Rouland's affidavit is not contested in its statements that various forms of prostitution, including sexual massages, "hand releases," and sadomasochistic sex, were occurring on the premises. Olender's only contentions regarding the accuracy of the affidavit concern the mistaken identification by Nicole Peckham—that Olender was the model for a massage training session—which was included in both affidavits,[9] and Olender's differing recollection of his conversations: (1) with Rouland and Berry on the night of November 14, 1994; (2) with Rouland and Knowles on November 16; (3) and with Rouland on the morning of November 17. Several of the facts which Olender disputes are extraneous to a finding of probable cause that Olender knew what was occurring on the premises, and took steps to hinder the police's investigation.[10] Other disputed facts, such as the Peckham identification, and Olender's allegation that he told Rouland that he only became suspicious after the police began investigating 568 Bristol Pike, may well have been relied upon to support a finding of probable cause. However, they cannot be controlling here because there is sufficient evidence remaining in the affidavit, even after all disputed material has been excised, to support a finding of probable cause to arrest Olender. The uncontested facts which establish probable cause are:

- Shockey was operating a house of prostitution at 568 Bristol Pike.[11]

- Olender and his wife owned 568 Bristol Pike and had an oral lease with Shockey, who paid $1,500 a month, in cash, to Olender. (Prob. Cause Aff. at 5; Olender Dep. (attached as Exh. A to Pl's Resp.) at 168).

- In response to a call from Shockey, about "suspicious persons" in the parking lot, Olender took to 568 Bristol Pike a poster of approximately 50 Bensalem police officers, and called the police to try to identify "Roland" and "Barry." (Prob. Cause Aff. at 11; Olender Dep. at 199–201). When the police executed the search warrant on November 14, 1994, they found the poster attached to the door, and an 8″ × 10″ picture of another officer. (Prob. Cause Aff. at 11). Olender admitted he had taken the 8″ × 10″ over to Shockey, stating that he was showing Shockey a special photographic technique he was using. (Prob. Cause Aff. at 11).

- On November 14, Nicole Peckham told Detective Knowles that Shockey had told her to study the faces of the officers, and was instructed not to perform "hand releases" (masturbation to ejaculation) on clients because the police were watching the place. (Prob. Cause Aff. at 10).

- Olender told Rouland that he knew that things inside 568 Bristol Pike were "a little weird," but that he didn't think they were doing anything illegal. He also

---

9. The fact that I find that their was probable cause to arrest Olender does not mean that I am untroubled by Olender's allegation, confirmed by Detective Rouland, that Rouland included the Peckham identification in his second probable cause affidavit, while knowing that Ms. Peckham had recanted that identification. The haste with which the second criminal complaint was filed against Olender does not excuse Rouland's actions on this point.

10. For example, Rouland states in the probable cause affidavit that Olender called the police station to determine whether "Roland" and

"Barry" were police officers before taking the police poster over to Shockey. Olender contends that he called the station after Shockey could not identify "Roland" and "Barry" from the poster. Also, the affidavit states that Shockey and Olender had a signed lease for 568 Bristol Pike. Olender states the lease was oral, not written.

11. *See generally* Prob. Cause Aff. Shockey pled guilty to promoting prostitution and conspiracy to promote prostitution before the Honorable Isaac S. Garb on April 17, 1995. Defs' Mot. Summ.J.Exh. I.

stated, "[Y]ou won't believe what you see. There's photos, tapes, devices, all kinds of things, but I don't think there's any sex." (Prob. Cause Aff. at 5). Olender told Rouland that he had been to the building to collect rent before November 1994 and had seen people walking around in leather outfits, with studded collars. (Prob. Cause Aff. at 23; Olender Dep. at 56)

- On the morning of November 17, 1994, following his questioning by Rouland the prior evening, in which Rouland indicated that Olender could be charged with facilitating prostitution, Olender met with his lawyer. Upon leaving that meeting, Olender stopped Rouland on the street and said, "I'm guilty of facilitating prostitution" and "I spoke with my lawyer today, he told me that the law is changed. He said there's some sort of a new case on sadomasochistic sex or something,[12] and it's illegal." (Prob. Cause Aff. at 12; Olender Dep. at 225–26).

In the context of the undisputed facts known to Rouland at the time, Olender's admission of guilt, after explaining that he had just spoken to his attorney, substantially undercuts Olender's argument that there was no probable cause to arrest him. Under the *Hunter* standard, probable cause to arrest exists if " 'at the moment the arrest was made ... the facts and circumstances within [defendants'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [plaintiff] had violated [the law]." 502 U.S. at 228, 112 S.Ct. 534. Under the circumstances, it was perfectly reasonable for a "prudent person" to conclude either: (1) Olender knew what was going at 568 Bristol Pike and took affirmative steps, e.g., delivering the police photographs to Shockey, to alert and protect the operation, notwithstanding Olender's protestations that his conduct was naive, but not criminal; or (2) Olender knew that sadomasochistic sex was occurring, but did not know that it was

illegal, which is not a defense to criminal culpability. The fact that Olender was given incorrect advice from counsel, and believed he could put the matter behind him by paying a fine, does not defeat whether, from Rouland's perspective, there was probable cause to arrest Olender. The totality of facts which Olender disclosed to his attorney in seeking that advice were not within defendant Rouland's knowledge at the time he executed his affidavits of probable cause.

For the reasons set forth above, I find that, after giving Olender's version of the facts every benefit of the doubt and purging all contested material from the probable cause affidavit, the affidavit objectively supports a finding of probable cause to arrest Olender. Thus, Olender has failed to meet his burden, under *Franks*, *Sherwood v. Mulvihill*, and *Lippay v. Christos*, of showing that the Detective Defendants violated his constitutional right to be free of arrest except upon probable cause. I therefore grant summary judgment to the Detective Defendants on all constitutional claims based on the allegation that Olender was arrested and prosecuted without probable cause.

## V. Common Law Claims Against the Dectective Defendants

### A. Count III—Common Law False Arrest and False Imprisonment

 For an action for false arrest against a police officer to succeed, it must appear that the arrest warrant was facially invalid. *See Lynch v. Johnston*, 76 Pa. Cmwlth. 8, 13, 463 A.2d 87, 89 (1983) ("For an action of false arrest to succeed, it must appear that the process used for the arrest was void on its face or that the issuing tribunal was without jurisdiction; it is not enough that the charges were unjustified."); *Roberts v. Toal*, 1997 WL 83748 at *19 (E.D.Pa.); *Cassidy v. Abington Township*, 131 Pa.Cmwlth. 637, 639 n. 1, 571 A.2d 543, 544 n. 1 (1990). "That the arrest and imprisonment were pursuant to a valid process constitutes a defense 'available to the party procuring its issuance, the judicial of-

---

**12.** In *Commonwealth v. Morrell*, 41 D. & C.3d 476, 479 (1986), Judge Reed held that sadomasochistic activity was included within the definition of 'sexual activity' under the Pennsylvania Prostitution Statute, 18 Pa.C.S. § 5902.

ficer issuing it ... the official to whom it is addressed, and those who assist him.'" *Schneider v. Kessler,* 97 F.2d 542, 544 (3d Cir.1938) (*quoting* 25 C.J. 477). "While defendants might well have committed the tort of malicious prosecution, defendants are not subject to liability for the tort of false arrest and [imprisonment], as plaintiff was arrested pursuant to a warrant." *Burt v. Ferrese,* 871 F.2d 14, 17 (3d Cir.1989).[13] To establish a claim for false imprisonment under Pennsylvania law, plaintiff must establish (1) the detention of another person, and (2) the unlawfulness of such detention. *Renk v. City of Pittsburgh,* 537 Pa. 68, 76, 641 A.2d 289, 293 (1994). However, false arrest and false imprisonment are essentially the same claim: "Under certain circumstances ... false arrest and false imprisonment are merely different labels which describe the same conduct. Detainment and confinement constitute the gravamen of the civil wrong committed by an individual who illegally asserts or employs authority over another while purportedly enforcing the law. This civil wrong can be denominated as either false arrest or false imprisonment." *Gagliardi v. Lynn,* 446 Pa. 144, 147, 285 A.2d 109, 110 (1971). Olender states in his pleading that there were warrants for both of his arrests, and does not allege that the warrants were facially invalid, or that the issuing court was without jurisdiction. Therefore, I will grant summary judgment to defendants and dismiss these claims.

## B. Count IV—Common Law Malicious Prosecution

 The elements of the commons law tort of malicious prosecution in Pennsylvania are: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendant's acted maliciously or for a purpose other than bringing the plaintiff to justice." *Hilfirty v. Shipman,* 91 F.3d 573, 579 (3d Cir.1996); *see also Cosmas v. Bloomingdales Bros. Inc.,* 442 Pa.Super. 476, 660 A.2d 83, 86–88 (1995). Pennsylvania courts appear to have adopted the *Franks* test in cases where a criminal defendant alleges that material information was incorrectly included in an affidavit in support of probable cause. *See, e.g., Commonwealth v. Henry,* 410 Pa.Super. 324, 329 n. 2, 599 A.2d 1321, 1323 n. 2 (1991) ("Even when the confession is excluded from the analysis of the probable cause affidavit, however, it is clear that the affidavit was sufficient.... Because [the uncontested] facts alone amply supported a finding that there was a fair probability that contraband would be found at appellant's home, the inclusion of appellant's confession in the affidavit does not defeat the finding of probable cause.") (*citing Franks,* 438 U.S. at 154, 98 S.Ct. 2674). "[T]he standard for evaluating whether probable cause exists is the 'totality of circumstances' test, set forth in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." *Commonwealth v. Rodriguez,* 526 Pa. 268, 272, 585 A.2d 988, 990 (1991). Probable cause exists when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Id.* (*citing Commonwealth v. Wagner,* 486 Pa. 548, 406 A.2d 1026 (1979)). Applying these standards, and for the reasons set out in my discussion of Plaintiff's Fourth Amendment claims, I find that the Defendants had probable cause to arrest Olender, and thus his claim for malicious prosecution fails and will be dismissed.

## C. Count V—Intentional Infliction of Emotional Distress

 To prevail on a claim of intentional infliction of emotional distress[14] a

---

13. The Court of Appeals in *Burt,* although applying Delaware law, held this despite the fact that it was "unable to find a Delaware case applying the distinction between malicious prosecution and false arrest to a case in which a person was arrested pursuant to a warrant issued without probable cause." *Id.* 871 F.2d at 17.

14. The Pennsylvania Supreme Court has not yet expressly recognized the tort of intentional infliction of emotional distress, set forth in section

plaintiff must prove that (1) the defendant engaged in conduct that was extreme and outrageous; (2) it must have been intentional or reckless; (3) in must cause emotional distress; and (4) that distress must be severe. *Hoy v. Angelone*, 456 Pa.Super. 596, 610, 691 A.2d 476, 482 (1997); *see also Silver v. Mendel*, 894 F.2d 598, 606 n. 16 (3d Cir.1990). Claims of intentional infliction of emotion distress rarely succeed, because a plaintiff must prove that the defendant's conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Hoy v. Angelone*, 720 A.2d 745, 753–54 (Pa.1998) (*quoting Buczek v. First Nat'l Bank of Mifflintown*, 366 Pa.Super. 551, 558, 531 A.2d 1122, 1125 (1987)).

In support of this claim, Olender alleges that the Detective Defendants (1) coerced a witness (Ms. Peckham) into implicating Olender, (2) falsely imprisoned and interrogated him without counsel, and (3) misrepresented the content of their investigation and thereafter arrested him. I will address these allegations in turn.

■ Throughout his pleadings, Olender claims that Defendant Rouland coerced or threatened Ms. Peckham on the night of November 14 into implicating Olender. This contention is a bald assertion of fact, without support in the record cited by Olender. In his Response to Defendant's Motion for Summary Judgment, on page 7, Olender states that Peckham was brought in to testify at his trial in June 1995, and "on cross examination, Nicole Peckham related that her identification of the plaintiff had been coerced by David Rouland, who threatened to take her son away if she did not implicate Robert Olender." The transcript of Peckham's testimony, however, reveals only that she felt threatened by Rouland to cooperate with the investigation (Exh. H to Pl.'s Resp. at 15–16), which, at that stage, concerned the entire investigation into prostitution at 568 Bristol Pike. In her testimony Peckham did not state that she was coerced into naming Olender. In fact, her trial testimony corroborates Detective Knowles testimony regarding Peckham's identification of Olender: that she mistakenly identified Olender as the driver of the white Jeep and "model" for the massage training, and that she informed her lawyer of the mistake as soon as she realized it at her arraignment in December. (*Id.* at 18; Exh. C to Pl's Resp. at 16–17). Thus, I will not consider Olender's contention—that Rouland coerced Peckham into identifying Olender—in my consideration of his claim for intentional infliction of emotional distress.

■ The remaining evidence Olender cites fails, as a matter of law, to state a claim for intentional infliction of emotional distress. Because I have determined that the Detective Defendants had probable cause to arrest Olender, his arrest and trial, even though he was found "not guilty" of the charges against him, do not support a claim for intentional infliction of emotional distress. Finally, although Olender may have felt unable to leave during Rouland and Knowles questioning of him on November 16, 1994, the ninety minute session, in which the only potential threat made against him was that he would be arrested for "facilitating" prostitution, and where Rouland allegedly prevented Olender from leaving by saying, "Sit down. Now calm down, calm down. Now, look, it ain't that bad," (Olender Dep. at 96–97), does not rise to the level of conduct that is "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Olender's evidence, even viewed in the light most favorable to him, fails to state a claim for intentional infliction of emotional distress, and I grant summary judgment to Defendants on this claim as well.

---

46(1) of the Restatement (Second) of Torts. *See Hoy v. Angelone*, 720 A.2d 745, 753 n. 10 (Pa. 1998) (" '[T]his Court has acknowledged but has never had the occasion to specifically adopt section 46 as the law in Pennsylvania.' ") (*quoting Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 184, 527 A.2d 988, 989 (1987)). In *Hoy*, the court again acknowledged section 46 and assumed arguendo that the tort existed, but found that the plaintiff had failed to establish a right to recovery. *Id.* The Third Circuit, however, has held that Pennsylvania's highest court will eventually recognize this tort. *See Silver v. Mendel*, 894 F.2d 598, 606 (1990).

## VI. Conclusion

Summary judgment is granted to Defendants on all claims in this action.